[No. H029918. Sixth Dist. Apr. 10, 2007.]

In re the Marriage of JULIE and ROGER SCHLAFLY.
JULIE SCHLAFLY, Respondent, v.
ROGER SCHLAFLY, Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.E.

**COUNSEL**

Roger Schlafly, in pro. per., for Appellant.

Julie Schlafly, in pro. per., for Respondent.

## OPINION

**MIHARA, Acting P. J.**—Appellant Roger Schlafly, former husband of respondent Julie Schlafly, appeals from an order modifying child support. Roger[1] claims that the court erred in imposing a child support payment that deviated from the guideline amount and in retroactively modifying child support without using actual income figures. Roger also claims the court erred in imposing an attorney's fees order contradicting an earlier order by the court. We conclude that the court erred in imputing $3,000 of nontaxable income per month based on Roger's mortgage-free housing. We therefore reverse the December 20, 2005 child support order and remand the action for further proceedings. We affirm the attorney's fees order.

## I. Background

Roger and Julie married in December 1996 and have two minor children, Millicent (born in 1997) and Geneva (born in 1999). Millicent was born three weeks after Julie graduated from law school, about six months into the marriage, and Julie remained at home throughout the marriage to care for the children. Roger, a mathematician, is self-employed and is an independent contractor in the computer software industry. In addition to other assets, Roger owns a minority interest in a closely held corporation, several patents, his own business, and a mortgage-free home.

The couple separated in October 2003, and Julie filed for dissolution of marriage. The parties initially split custody of the children 50-50 by mutual agreement, and, in July 2004, the court ordered Roger to provide Julie a temporary support payment of $3,000 per month. The court also set a hearing in August 2004 to discuss financial issues and ordered Roger to file and serve an income and expense declaration and to provide recent tax returns.

During the August 30, 2004 hearing, the court (the Hon. Thomas Kelly presiding) chastised Roger for providing "evasive" answers and incomplete information regarding his financial situation. The court ultimately ordered $2,759 in child support, retroactive to July 1, 2004. In doing so, the court deviated from the guideline amount of $1,697 based on Roger's "living mortgage-free in house worth 3K/month." The additional $1,062 increased Roger's total support payment to $4,000 per month. The support order was made retroactively modifiable so that it could be revised when the court had

---

[1] Because the parties share a common surname we use their given names to avoid confusion.

"more information on father's actual income" and on Julie's efforts to enter the workforce.

On November 16, 2004, Roger's custody percentage decreased from 50 percent to approximately 20 percent. On May 13, 2005, the court conducted another status hearing regarding financial issues. Judge Kelly modified the temporary support figures to reflect the adjusted timeshare, retroactive to November 16. In doing so, the court expressly stated that it was not taking into account the fact that Roger lived in a mortgage-free house: "Since today is a snapshot, temporary order, I'm not going to depart from guideline [based on a lack of·mortgage] . . . . But she's going to make an argument next month I should depart from guideline as I did before." The child support order thus was modified to $2,575, the DissoMaster guideline amount based on the financial information then available. The court again ordered Roger to produce financial documents, intending to address the mortgage-free housing issue at a later hearing when the court believed more accurate information would be available. The support orders were again made retroactively modifiable, and the court entered a judgment of dissolution as to status only.

Roger provided Julie with his 2004 tax return in October 2005, and a new hearing was set for December 2005 before Commissioner Irwin H. Joseph, who took over the case from Judge Kelly. On December 20, 2005, the court issued a new child support order of $2,525, effective January 1, 2006, "based on changed income and timeshare for father." The court ordered further modification, effective January 23, 2006, to $2,112, based on an anticipated increase in Roger's timeshare to 50 percent. In calculating the new payments, the court imputed a 3 percent rate of return for Roger's stock market portfolio as taxable income and imputed $3,000 in nontaxable income per month based on Roger's mortgage-free housing. After calculating the guideline amount, the court added $500 to provide for the children's education and activities, split evenly between the parties. Julie waived her rights to any future spousal support.

In the December 20 order, the court also addressed past support payments. The court modified the child support order effective November 16, 2004, to account for Roger's mortgage-free housing, noting that "Judge Kelly failed to perpetuate his calculated deviation for father's housing circumstance. " In this instance, the court adopted Judge Kelly's approach and added $1,062 to the guideline amount.

Roger filed a motion for modification, deemed a motion for reconsideration, contesting both the December 20 child support order and a December 16

order regarding attorney's fees. The court denied the motion on February 16, 2005. Roger timely appealed.

## II. Discussion

■ Statutory guidelines regulate the determination of child support in California. (See Fam. Code, §§ 4050–4203.)[2] The guidelines set forth several important principles relating to child support determinations, including that (1) the interests of the child are the state's top priority, (2) a parent's principal obligation is to support his or her children "according to the parent's circumstances and station in life," (3) "[b]oth parents are mutually responsible for the support of their children," (4) "[e]ach parent should pay for the support of the children according to his or her ability," (5) children should share in both parents' standard of living, and (6) in cases "in which both parents have high levels of responsibility for the children," child support orders "should reflect the increased costs of raising the children in two homes and should minimize significant disparities in the children's living standards in the two homes." (§ 4053, subds. (a), (b), (d)–(g).) The guideline amount of child support, which is calculated by applying a mathematical formula to the relative incomes of the parents, is presumptively correct. (See §§ 4055, 4057, subd. (a); *In re Marriage of de Guigne* (2002) 97 Cal.App.4th 1353, 1359 [119 Cal.Rptr.2d 430] (*de Guigne*).) "The court may depart from the guideline only in 'special circumstances' set forth in the child support statutes. (§ 4052.)" (*County of Stanislaus v. Gibbs* (1997) 59 Cal.App.4th 1417, 1419 [69 Cal.Rptr.2d 819].)

A child support order is reviewed for an abuse of discretion. (*In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 282 [111 Cal.Rptr.2d 755] (*Cheriton*); see also *In re Marriage of Destein* (2001) 91 Cal.App.4th 1385, 1393 [111 Cal.Rptr.2d 487] (*Destein*) ["A trial court's decision to impute income to a parent for child support purposes based on the parent's earning capacity is reviewed under the abuse of discretion standard."].) We determine "whether the court's factual determinations are supported by substantial evidence and whether the court acted reasonably in exercising its discretion." (*de Guigne, supra,* 97 Cal.App.4th 1353, 1360.) We do not substitute our own judgment for that of the trial court, but determine only if any judge reasonably could have made such an order. (*Ibid.*)

In this case, Roger claims the court "erroneously deviated from [the] guideline" amount by imputing a rate of return to his stock portfolio that

---

[2] All further statutory references are to the Family Code unless otherwise noted.

exceeds the actual rate of return, by including $3,000 of nontaxable income based on his mortgage-free housing, and by imposing a discretionary add-on for the children's activities. He also claims the court failed to comply with section 4056, modified a temporary child support order using inaccurate figures, and erred in ordering him to pay an additional $6,500 in Julie's attorney's fees.

### A. Imputation of 3 Percent Rate of Return

Roger first objects to the court's imputation of a 3 percent rate of return on his stock market portfolio. At the time of the order, Roger's portfolio contained approximately $2.9 million in assets and, according to Roger, paid dividends of about 1.6 percent annually.[3] Roger contends that because the portfolio was income producing,[4] the court was required to use the actual income received and was not authorized to impute additional income. We disagree.

Section 4058, which defines annual gross income for purposes of child support calculations, expressly provides: "The court may, in its discretion, consider the earning capacity of a parent in lieu of the parent's income, consistent with the best interests of the children." (§ 4058, subd. (b).) This earning capacity doctrine "embraces the ability to earn from capital as well as labor." (de Guigne, supra, 97 Cal.App.4th at p. 1363; see also Mejia v. Reed (2003) 31 Cal.4th 657, 671 [3 Cal.Rptr.3d 390, 74 P.3d 166] ["[i]n assessing earning capacity, a trial court may take into account the earnings from invested assets"].) "Just as a parent cannot shirk his parental obligations by reducing his earning capacity through unemployment or underemployment, he cannot shirk the obligation to support his child by underutilizing income-producing assets." (In re Marriage of Dacumos (1999) 76 Cal.App.4th 150, 155 [90 Cal.Rptr.2d 159] (Dacumos), italics added.)

In this case, the court implicitly determined that Roger's 1.6 percent return on almost $3 million of assets was an underutilization of the assets and that imputing a higher rate of return was in the best interests of the children.

---

[3] Roger cites no support for his claim that the stock portfolio pays dividends of about 1.6 percent, other than to claim that a 1.6 percent rate of return is approximately the stock market average. His motion for reconsideration in the trial court further explains that his portfolio's diversity "roughly approximates the USA market average" and that the Standard & Poor's 500 "currently earn about 1.6 in dividends," which also is comparable to his portfolio's returns.

[4] Roger's 2004 tax return shows that he earned ordinary dividends of $38,855 for the year. According to the figures adopted by the trial court, Roger's stock market portfolio contained $2,932,841.10 in June 2004. $38,855 is approximately 1.3 percent of $2,932,841.10.

The court explained that the 3 percent figure was a more accurate reflection of the value of the assets; unless Roger was earning at least 3 percent annually in the stock market, he would invest in bonds and be guaranteed a 3 percent return. This determination was within the court's discretion. (See *In re Marriage of LaBass & Munsee* (1997) 56 Cal.App.4th 1331, 1340 [66 Cal.Rptr.2d 393] (*LaBass*) ["Section 4058 is unmistakably clear that the only qualification to the discretionary imputation of income is that it be consistent with the children's best interest."]; *Destein, supra*, 91 Cal.App.4th at p. 1396 ["[O]ur Supreme Court has refused to read any limitation into a trial court's discretion to impute income when in the child's best interests."].)

The court's decision is well supported by California case law. *Dacumos, supra*, 76 Cal.App.4th 150 provides one persuasive example. In that case, the father owned two rental properties that generated higher expenses than the amount received in rent. (*Id.* at p. 153.) The trial court nevertheless imputed rental income based on the fair market rental value of the properties and the father's net equity in the properties. (*Ibid.*) The appellate court concluded that a broad "definition of earning capacity to include income that could be derived from income-producing assets as well as from work is in accord with the legislative intent" and found no error. (*Id.* at pp. 154–155.) We find no basis to distinguish *Dacumos*, in which the properties were utilized as rentals but were underperforming, from the case at hand. Roger's $2.9 million stock market portfolio earns only the barest amount of "income," and, thus, is underutilized as an income-producing asset.

Roger cites as support *In re Marriage of Pearlstein* (2006) 137 Cal.App.4th 1361, 1374–1375 [40 Cal.Rptr.3d 910], in which the court held that stock received in the sale of the father's business was a capital asset, not income. The court's holding is not contrary to the approach taken in this case. The *Pearlstein* court in fact held that although the stock was a capital asset, "in the court's discretion, a reasonable rate of investment return could be imputed to the value of the stock that was available for sale, and that amount added to [the father's] gross income . . . ." (*Id.* at p. 1376.) That is precisely the approach taken in this case.

■ Roger's argument that the imputation is invalid because the court has no authority to direct his investment strategy also is unavailing. The trial court has broad discretionary authority to impute income and need not defer to the parent's choice of investment. (*Destein, supra*, 91 Cal.App.4th at p. 1391.) Roger's decision to prioritize future value over current income does not mean that the $2.9 million in assets must be disregarded as a source of support. As the *Destein* court explained, quoting an opinion by the New York Court of Appeals, a parent " 'may be required to make his considerable assets earn income which, by an objective standard, is commensurate with at least a

conservative estimate of what they are capable of producing, and, when he fails to do so, he may be treated as though he had; his decision to let them grow for his own future benefit is not one which the courts are obliged to honor in all circumstances.' " (*Id.* at p. 1395, quoting *Kay v. Kay* (1975) 37 N.Y.2d 632 [339 N.E.2d 143, 376 N.Y.S.2d 443].) Ignoring the stock market portfolio, or recognizing only a small fraction of its substantial value, would "effectively permit[] [Roger] to avoid his obligation to support his children according to his 'ability,' his 'circumstances and station in life,' and his 'standard of living.' " (*Cheriton, supra,* 92 Cal.App.4th at p. 292, quoting § 4053, subds. (a), (d) & (f); see also *Destein, supra,* 91 Cal.App.4th at p. 1395 [noting that a parent may not place a source of possible income " ' "off-limits" ' " through his or her choice of investment].)

■ We next consider the court's use of 3 percent as a reasonable rate of return. As Roger rightly contends, "figures for earning capacity cannot be drawn from thin air; they must have some tangible evidentiary foundation." (*In re Marriage of Cohn* (1998) 65 Cal.App.4th 923, 931 [76 Cal.Rptr.2d 866].) In this case, however, we find ample support for the imputed rate of return.

At the December hearing, the court explained that 3 percent represents the minimum anticipated return on investment for bonds or certificates of deposit. Roger did not contest the assumption that 3 percent was a reasonable rate of return for these types of investments, just that they were not his preferred forms of investment; in fact, Roger acknowledged that certificates of deposit and some bonds would pay 3 percent.[5] We therefore find that the application of a 3 percent rate of return—an estimate that is supported by common knowledge and common sense—is supported by substantial evidence.

■ Finally, we reject Roger's argument that the court erred in failing to comply with section 4056. Section 4056 requires the court, among other things, to state in writing or on the record the reasons it deviated from the guideline amount and why the deviation is in the best interests of the children. (§ 4056, subd. (a).) The court's decision to substitute earning capacity for actual income is not, however, a deviation that requires compliance with section 4056. (*LaBass, supra,* 56 Cal.App.4th 1331, 1336–1337.)

---

[5] "The Court: Because bonds pay almost four percent now, bonds are absolutely safe.

"Mr. Schlafly: Some bonds do. But it's not invested in bonds. Are you saying I should sell my stock and buy bonds instead?

"The Court: I'm saying you've taken the choice of a risky investment. That doesn't eliminate the ability for you to chose [*sic*] a stable investment. [¶] . . . [¶]

"The Court: You can go to any of the banks here in town and say I have three million dollars cash I'd like for you to take care of for me. They would have you in CD's, guaranteed, insured CD's that would pay you a great deal more than three percent.

"Mr. Schlafly: That's right, but the assets would decline because—real assets would decline because of inflation if I do that."

The imputation of income relates to an input in the guideline calculation, and is not a deviation from the final guideline amount. (See *id.* at p. 1337.) We therefore find no error in the court's failure to note "special circumstances" justifying the imputation of a 3 percent rate of return.

■ In sum, we find no abuse of discretion in the court's imputation of income relating to Roger's $2.9 million stock market portfolio.

### B.  Mortgage-free Housing

Roger next objects that the court erroneously "deviated" from the guideline in including $3,000 in the income calculation to account for his mortgage-free home.

The impact of free housing on child support payments has been discussed in several different cases. In two cases—*Stewart v. Gomez* (1996) 47 Cal.App.4th 1748 [55 Cal.Rptr.2d 531] (*Stewart*) and *County of Kern v. Castle* (1999) 75 Cal.App.4th 1442 [89 Cal.Rptr.2d 874] (*Kern*)—the court characterized the fair value of the obligor parent's free housing as income. In *Stewart*, the father lived rent free on an Indian reservation. (*Stewart, supra,* 47 Cal.App.4th at pp. 1754–1755.) The trial court included "the reasonable value of the free rent he received" as part of the father's section 4058 income in calculating child support. (*Stewart,* at p. 1752.) The appellate court affirmed, citing subdivision (a)(3) of section 4058, which gives the court discretion to consider as income " 'employee benefits or self-employment benefits, taking into consideration the benefit to the employee, *any corresponding reduction in living expenses,* and other relevant facts.' " (*Stewart,* at p. 1755–1756.) The court concluded that there was "no reason to distinguish an employee housing benefit from an Indian reservation housing benefit." (*Id.* at p. 1755.) Thus, the trial court "properly included the reasonable rental value of [the father's] house as income." (*Ibid.*)

The appellate court in *Kern, supra,* 75 Cal.App.4th at pages 1456–1458, found that the lower court erred in excluding from income any consideration of the benefits the father received as a result of his $1 million inheritance. Citing *Stewart,* the court observed that, among other things, "the trial court here could have discretionarily considered as income the mortgage-free housing [the father] was living in because he paid the mortgage off with part of the proceeds from his inheritance." (*Id.* at p. 1451.)

The Fourth District, in *In re Marriage of Loh* (2001) 93 Cal.App.4th 325, 333–336 [112 Cal.Rptr.2d 893] (*Loh*), discussed at length the propriety of incorporating nontaxable benefits into child support calculations and ultimately disagreed with the approach set forth in *Stewart* and recognized in *Kern.*

Reiterating that income tax returns are presumptively correct in calculating a parent's income, the *Loh* court observed that *Stewart* and *Kern* "departed altogether from an income tax model of section 4058 income with regard to certain free housing benefits." (*Loh, supra,* 93 Cal.App.4th at pp. 332–333.)

■ The *Loh* court first questioned the limits of a rule that allows courts to consider anything that reduces living expenses as income, pointing out that it leads to support payments based on money the parent does not have. (*Loh, supra,* 93 Cal.App.4th at p. 334.) Moreover, the *Stewart* rule, which recognizes as income free housing provided by third parties, is incongruous when compared to the prohibition on considering free housing provided by a new partner or spouse in ordering child support. (*Id.* at pp. 334–335.) Second, the court noted that section 4058, subdivision (a)(3) refers to *employee* benefits that reduce living expenses, and found no statutory justification for interpreting the plain language of the statute to include as income reductions in living expenses not related to employment. (93 Cal.App.4th at p. 335.) The *Loh* court therefore concluded that if a trial court determines that a parent's housing situation (or other lifestyle factors) renders application of the guideline amount inappropriate or unjust, such a fact may be considered in a deviation from the guideline, but may not be included as nontaxable income. (*Id.* at pp. 335–336.) "[T]he proper course [i]s to first calculate the guideline amount in light of the parents' incomes as revealed by such evidence as tax returns, income and expense declarations and pay stubs, and, then, under section 4057, to adjust the amount upward in light of the free housing benefit. Such an approach respects the rebuttable correctness of the mechanically calculated guideline amount, and allows child support awards to properly reflect the parents' standard of living without doing violence to the word 'income' in a way that would make the Sheriff of Nottingham proud." (*Ibid.,* fn. omitted.)

■ We believe that the approach outlined in *Loh* is better suited to the facts of this case. Under the plain language of section 4058, the court's ability to consider housing benefits as income is limited to cases involving employment-related housing benefits. An upward adjustment pursuant to section 4057, as *Loh* suggests, ensures that the court specifies the basis for its deviation from the guideline amount, but still allows the court to recognize the impact a parent's free housing may have on the parent's living expenses and resources. (See § 4057, subd. (b) [requiring the court to state its reasons for departing from the guideline on the record or in writing pursuant to § 4056].) Under section 4057, subdivision (b)(5), the presumption that the guideline amount of child support is correct is rebuttable based on evidence showing that application of the guideline formula "would be unjust or inappropriate due to special circumstances in the particular case." "Special

circumstances" may include the fact that one parent, in a case with substantially equal custody, uses a much higher or lower percentage of income on housing. (§ 4057, subd. (b)(5)(B).)

Turning to this case, we note that it involves both the approach outlined approvingly in *Loh* and the approach used in *Stewart*. Judge Kelly used the *Loh*-sanctioned approach and elected not to include the $3,000 rental value of Roger's house as nontaxable income.[6] The court instead departed from the guideline amount, after the guideline amount was calculated, by approximately $1,000 to reflect the fact that Roger had fewer housing expenses than otherwise would be expected. The court referred specifically to the "special circumstance" of Roger's having reduced living expenses and cited *Loh* as support for the deviation. We find no error in this consideration of Roger's mortgage-free housing situation in determining the appropriate amount of child support.

Similarly, we find no error in Commissioner Joseph's subsequent order modifying the temporary child support order, effective November 16, 2004, to account for Roger's mortgage-free housing. Commissioner Joseph deferred to Judge Kelly's calculation of Roger's increased ability to pay support based on his housing situation, and, like Judge Kelly, deviated upward from the guideline amount by $1,062. Contrary to Roger's argument, this modification did not impose a payment that Judge Kelly had rejected, but instead implemented the deviation that Judge Kelly intended to reconsider once updated financial information was available.[7]

In calculating the child support payments effective January 1 and January 23, 2006, in contrast, Commissioner Joseph adopted the approach used in *Stewart*. In the order, the court acknowledged that it "calculated the housing benefit to father different than Judge Kelly" and explained that it included $3,000 of nontaxable income as "a part of the dissomaster calculation." The $3,000 of imputed income, based only on the purported rental value of the house, bears little or no relation to Roger's actual monthly income. Roger's mortgage-free housing is not an employee benefit, nor is there evidence that it resulted from an effort to funnel income into a form that would not be recognized in the DissoMaster calculation. We therefore conclude the court abused its discretion in including the purported rental value of Roger's

---

[6] The court explained: "What I'm going to do is adopt the version without the nontaxable income [of $3,000 per month], . . . and I'm going to depart from guideline to have a total support figure of $4,000. Departing from guideline is based on father not having any house expense. And again the Loh case is the authority I'm relying on."

[7] Roger also argues that Julie lives rent free due to a boyfriend, and questions why that is not incorporated in the guideline calculation. Section 4057.5 prohibits such a consideration. Roger further challenges the basis for the finding that the fair rental value is $3,000. Because we reverse the order imputing $3,000 in fair rental value, we do not reach this argument.

residence as nontaxable income. We reverse the December 20 child support order and remand to the court to determine the proper guideline amount. On remand, the court may again consider whether Roger's mortgage-free housing is a special circumstance under section 4057 justifying deviation from the guideline amount.

### C.   Discretionary Add-on for Activities

In the December 20, 2005 order, the court included a discretionary add-on of $500, to be split evenly by the parties. Roger objects to the add-on, arguing that child support payments must be based solely on income, and that the court has no authority to impose payments for optional activities that one parent considers important.

Section 4062 "makes discretionary ('the court may order') additional child support *for educational or special needs of a child* or for travel expenses for visitation. Among the family law bench and bar, these are usually referred to as . . . discretionary add-ons." (*In re Marriage of Fini* (1994) 26 Cal.App.4th 1033, 1039 [31 Cal.Rptr.2d 749] (*Fini*), italics added.) "The amounts in Section 4062, if ordered to be paid, shall be considered additional support for the children and shall be computed in accordance with the following: [¶] (a) If there needs to be an apportionment of expenses pursuant to Section 4062, the expenses shall be divided one-half to each parent, unless either parent requests a different apportionment pursuant to subdivision (b) and presents documentation which demonstrates that a different apportionment would be more appropriate." (§ 4061.)

In the December 2005 status report, in preparation for the December hearing on modification of child support, Julie included a detailed list of the girls' activities over several months and the attendant expenses. Julie testified during the December hearing regarding the children's diminished standard of living since the divorce, including attendance at public school instead of private school. She also testified regarding the approximate cost of the girls' various recreational and educational activities and specified the activities she could no longer afford. After hearing Roger's arguments on the subject, the court included a discretionary add-on of $500 in the child support order: "And that takes care of diminished ability to provide for things as varied as private school, tap dance, gymnastics, dance, dance teams, and other stay-at-home mom activities. [¶] I valued that roughly at $500 a month as being the obligation in order to maintain a standard that was previously enjoyed, half of which will be father's obligation."

We find no abuse of discretion. Section 4062 provides for discretionary add-ons to account for the specific needs of the children, including their

educational needs. Moreover, the guidelines stress that the parents are mutually responsible for the support of the children, and that the children should be supported according to each parent's ability to pay and standard of living. (See § 4053, subds. (b), (d) & (f).) The court's approach is consistent with the case law, and is a valid exercise of the broad authority entrusted to the court to mitigate a decline in the children's standard of living postdissolution. (See, e.g., *de Guigne, supra,* 97 Cal.App.4th at pp. 1364–1365 [increases over guideline amount justified to "mitigate an overall decline in the children's standard of living"; $15,000 child support award "rationally related to the children's predissolution standard of living and expenses, and to [father's] ability to pay"]; see also *Fini, supra,* 26 Cal.App.4th 1033, 1044 ["[T]he court in child support proceedings, to the extent permitted by the child support statutes, must be permitted to exercise the broadest possible discretion in order to achieve equity and fairness in these most sensitive and emotional cases."].)

### D. Improper Modification

Roger further argues that it was error for the court to modify the temporary child support orders without using "actual" income figures. This argument is without merit. First, after reviewing the prior orders and the parties' evidence regarding income, Commissioner Joseph concluded that *no change* was necessary to the temporary orders based on the updated financial information provided. The court's only modification to the past support payments was based on the mortgage-free housing issue, discussed above: "The court has reviewed all previous support orders and concludes as follows: Effective July 1, 2004, Spousal Support was set for $1241 and Child Support at $2759 . . . This computation seems correct. [¶] Effective November 16, 2004, there was a timeshare change. Spousal Support was set at $1885 and Child Support at $2575. However, Judge Kelly failed to perpetuate his calculated deviation for father's housing circumstance. Therefore Child Support until December 31, 2005 should have been set at $3637." Second, Roger points to no specific differences between the income figures used to calculate the temporary awards and the "actual" or "better" income figures he contends were overlooked. We therefore find no abuse of discretion in the court's modification, or lack thereof, of the temporary support orders.

### E. Attorney's Fees*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante,* page 747.

## III.   Disposition

The December 20, 2005 child support order is reversed with directions to recalculate the base child support payments, effective January 1 and January 23, 2006, omitting $3,000 in nontaxable income attributed to Roger's mortgage-free housing. On remand, the court may consider whether Roger's mortgage-free housing is a special circumstance under section 4057 justifying deviation from the guideline amount. The attorney's fees order is affirmed. The parties are to bear their own costs on appeal.

McAdams, J., and Duffy, J., concurred.